

FILED

Nov 13 2020, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Walter J. Alvarez
Steven J. Alvarez
Andreas T. Kyres
Crown Point, Indiana

Kenneth B. Elwood
Christopher D. Stidham
Portage, Indiana

ATTORNEY FOR APPELLEE

Anna Maria Hearn
Law Office of Anna M. Hearn,
LLC
Valparaiso, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

R. W.,

*Appellant-Respondent,*

v.

J. W.,

*Appellee-Petitioner.*

November 13, 2020

Court of Appeals Case No.
19A-PO-2697

Appeal from the Porter Superior
Court

The Honorable Brian Hurley,
Judge Pro Tempore

Trial Court Cause No.
64D05-1909-PO-8995

**Friedlander, Senior Judge.**

[1] R.W. appeals from the entry of a permanent protective order against him,
contending that the trial court erred by denying his motion to dismiss the
petition for an order of protection filed by J.W., a woman with whom he was in

a romantic relationship, and by finding that there was sufficient evidence to support the legal conclusion to issue the order. We affirm.

[2] R.W. raises the following issues for our review:

> 1. Did the existence of an emergency order of protection issued in Illinois in favor of R.W. require the trial court to transfer J.W.'s Indiana petition for protective order to Illinois under Ind. Code § 34-26-5-6(4) (2003)?

> 2. Was there sufficient evidence to sustain the trial court's findings of fact supporting its conclusion of law to enter the order of protection in favor of J.W. and against R.W.?

[3] J.W. is married and the mother of four boys. R.W. is a divorced father and was an anchorman at a Chicago news station. In March of 2019, R.W. contacted J.W. by private message, commenting "nice picture" through Instagram about a photo she had posted. Tr. Vol. I, p. 45. J.W. did not respond to the comment. He reached out to her again, inquiring if she knew two women with whom he was friends after noticing that they had two Instagram friends in common; one from St. Louis, and one from Virginia. She knew one of those friends, K.B., a resident of Virginia and flight attendant employed by United Airlines, through social media. R.W. told J.W. that he had recently broken up with K.B., who he described as "very jealous" and "cruel." *Id*. 45-46. J.W. responded that there are always two sides to a story while she also expressed sympathy toward R.W. J.W. also informed him that K.B. had blocked her from social media.

[4]     On June 23, 2019, R.W. contacted J.W. stating, "You seem really wonderful.  I know you're married. . . . I promise I can be trusted with your number. (smile emoji)."  *Id.* at 47; Ex. 1, p. 9.  J.W. gave her phone number to R.W.

[5]     Within two days of receiving J.W.'s phone number, he began texting her, expressing a romantic and sexual interest in her, and he began quoting scripture.  He stated "You're an amazing woman.  There's something truly special about you.  I want to find out more about you. . . . I adore you."  *Id.* at 47-48; Ex. 1, p. 14.

[6]     The following is a sample of his overtures to J.W.:

> I wish I could take you out.  Give you the affection you're probably sorely missing.  Physical, emotional, tell you how beautiful you are all the time.  You have such a huge heart and have so much to give.  Would you like that?
>
> ****
>
> I am going to mercilessly flirt with you until you tell me yo[sic] stop!  (devil emoji).
>
> * * * *
>
> Since my last breath up, I've been taking time and praying for God to bring someone into my life that would match my frequency and be able to go to new heights. . .in God's time of course.  I hope you are that person, but I know I will have to be patient.  In the meantime, I hope we can spend time getting to know one another.  Having a relationship I've always dreamed of is worth waiting for.  Heck, I've waited this long! (laughing emoji).

* * * *

You deserve to be happy.  God wants us to be happy.  Let me
try.  I believe there's a reason God connected us.  If I got to hold
you in my arms, you'd know what it feels like to be adored and
wanted.

* * * *

I need you [J.W.].

*Id.* at 48-49; Ex. 2, pp. 19-23.

[7]     In July, R.W. continued to quote scripture, but also sent to her a picture text of

his genital area.  He then made a request texting, "Now since I've been a good

boy go take pics of that sexy body of yours later and send them to me so I can

imagine you're with me where you belong[.]"  *Id.* at 224; Ex. 25, p. 217.  J.W.

sent intimate nude and semi-nude pictures to R.W. after his assurances.

[8]     On July 12, 2019, the two met at a hotel in Chesterton, Indiana for a sexual

encounter.  Within a few days of the encounter with J.W., R.W. went on

vacation with another woman, M.E., a television anchor working out of St.

Louis.  J.W. became aware of this and was upset.  R.W. later explained to her

that the vacation was taken for the purpose of breaking things off with M.E. so

that he could be with J.W.  At the end of July after J.W. and R.W. reconciled,

they met again in Indiana for lunch.  They later met at R.W.'s home in Chicago

on August 22, 2019 for a sexual encounter.

[9] Meanwhile, on August 3, 2019, the relationship began to break down yet again. Starting then through August 6th, R.W. expressed concern about whether third parties knew about his relationship with J.W. They had disagreements about other women with whom R.W. was involved.

[10] Next, J.W. resumed communicating with K.B. The two discussed R.W. and his involvement with J.W., K.B., and other women. Around that time, on August 10, 2019, R.W. wanted to send a video he had of K.B., who was nude in the video, to a surgeon she was dating. He asked J.W., "Do me a favor and go to [K.B.'s] page and screen grab the plastic surgeon. K.B. hooked me in sending my naked videos and pics . . . she crossed the line but I followed. I think her guy needs to know." Ex. 4, p. 101.

[11] Although J.W. advised him against that, R.W. suggested setting up another Instagram account to contact the surgeon through his office. R.W. threatened K.B. by email stating, "Keep in mind [K.B.] I still have all the texts you sent me and the naked video of you and I know the name of the plastic surgeon you're dating." Ex. 5, p. 108. Preemptively, K.B. sent emails to her friends telling them that her Facebook account had been hacked and not to open a video attachment if they received a post from her. K.B.'s YouTube and Facebook accounts were hacked, and the video of K.B., who was nude in it, was posted and sent to all of K.B.'s friends.

[12] J.W. and K.B. exchanged emails on August 11, 2019 about K.B. reaching out to a man, B.O., with whom J.W. previously had a sexual relationship. J.W. then sent an email to R.W. accusing him of causing K.B. to reach out to B.O. J.W. also argued with R.W. about blocking her from social media. J.W. texted R.W. about text conversations between K.B. and R.W. In those conversations, K.B. claimed that R.W. blocked J.W. from social media because she was too forward and had stalked him. K.B. sent the text conversations to J.W. R.W. claimed to J.W. that he was referring to another woman with the same first name and was talking about blocking her. By that time, it was apparent that K.B. and R.W. had renewed their relationship.

[13] J.W. told R.W. on August 12, 2019 to stay away from her and that she was going to report his behavior to the police. The two had exchanged and continued to exchange heated emails about each other, K.B., B.O. and others, arguing about hacking into or creating fake accounts on social media and reaching out to other persons about various relationships. J.W. confronted R.W. about having to change her "mommyof4boys" email account because R.W. had told K.B. that J.W., using that email account, was stalking him. Ex. 5, p. 103.

[14] J.W. shared some text exchanges between her and R.W. to K.B. R.W. learned about it and became upset. At one point, R.W. threatened J.W. that she would go to jail and lose her four sons. J.W.'s continued response to the repeated exchanges was to ask that R.W. and K.B. leave her alone and, if they did not,

she would contact the police. An example of J.W.'s request was her email on August 17, 2019,

> I want this behavior to stop . . . . You know involving [K.B.] would be traumatic for me and she would be evil. You let it happen. Now, B.O. and K.B. are attacking me at every angle to make themselves look better and feel better. . . The verbal abuse and lies are so painful nobody should feel this. I don't want you to reply, you lost all your chances to fix this and be my friend. . . . If you mention my name to [K.B.], [B.O.] or anyone for that matter or continue to harass me and slander my name; it will be used against you.

Ex. 6, p. 118.

On August 23, 2019, R.W. left a voicemail message stating,

> You're sharing our text messages, our private conversations with other people. This is illegal. I'm not [f**king] around with you anymore, [J.W.]. I am not saying a word about you to anyone. I am not talking to anyone about you. You, you are trying to on [sic] my reputation, and I have proof of that. Stand the [f**k] down now. Delete every one of those [f**king] text messages. And if you–and I swear to [f**king] God I will sue you for everything for [f**king] with my reputation, sharing personal–personal conversations with other people. You are a sick [f**k], [J.W.] and you deserve to go to jail. And, I'm going to make sure that happens. How dare you.

Tr. Vol. I, p. 73. J.W. felt threatened and terrified by the message in the voicemail. R.W. then immediately made multiple attempts in a short period of time to contact J.W.'s husband by email and Instagram, indicating that he needed to talk with him about J.W.

On August 24, 2019, R.W. sent an email to J.W. stating that K.B. "somehow was able to access my phone, she knew my old password and download[ed] all of the naked photos of you that you sent me. She's very upset that you contacted [a man] and [I] don't know what she's going to do with them. Sorry." Ex. 7, p. 122. K.B. posted photographs of herself dated August 21, 2019 to August 28, 2019 in Chicago where R.W. worked and lived, depicting her at R.W.'s condo and at the Art Institute. R.W. was pictured by himself at the Art Institute during that same time period in a photograph he posted on social media.

During this time, K.B. then began sending texts to J.W. stating,

> Hi [J.W.]. I just heard someone say that they were sending these photos to your children's school. I'm very worried about you. Are you OK? Be more careful when you send these photos out!!! I don't want your children and husband to see them. . . . I think a lot of your friends got a hold of them too. Are you ok??. . . I feel so bad for you!! Call the police. I'm very worried that these photos won't go through Valparaiso. I just don't want them to get in the hands of your children or husband.

Ex. 9, p. 133-34.

On September 11, 2019 at 12:07 p.m., the Cook County, Illinois Court issued an emergency order of protection in favor of R.W. and against J.W. The persons sought to be protected in that order were R.W., K.B., and M.E., however, the order only applied to R.W. On September 11, 2019 at 12:14 p.m.,

K.B., sent an email to J.W. which contained an explicit photograph that J.W. had sent to R.W., with the comment, "Far from perfect! So gross[.]" *Id.* at 123-24. K.B. sent another email to J.W. saying, "Since you've been sleeping around on your husbands[sic], you've contracted herpes. If you don't tell him about your virus, I will. He has a right to know!!!" *Id.* at 124. K.B. wrote to J.W. in a further email, "Your husband has a right to know honey [t]hat you're exposing him to herpes." *Id.* In yet another email, K.B. wrote to J.W. and cc'd R.W., "Do your children and husband know you send trashy photos of your infected vagina to men in who [sic] are in relationships. Geez. You're so desperate it's disgusting. Poor [M.E.] had no idea what a tramp you are. [B.O.] said, you have bad skin and your vagina looks like an old steak." Ex. 11, p. 159. K.B. was in Chicago with R.W. at the time these emails were sent. A post on social media dated September 9, 2019, shows K.B. in Chicago after returning from Amsterdam. R.W. admitted that he saw the email.

[19] On September 19, 2019, J.W. filed an ex parte petition for order of protection and a hearing was set for October 17, 2019. On October 15, 2019, R.W. filed a motion to continue the hearing, which was granted causing the hearing to be reset to October 30, 2019. In that Motion, R.W. did not raise the issue he raises now, specifically that J.W. incorrectly filed her petition in Indiana when she should have filed her petition in Illinois. Instead, R.W.'s attorney stated that he was unavailable for the hearing because he was in trial.

[20]    Meanwhile, around October 1, 2019, J.W. found out that a Bumble[1] account was created using her email address. R.W. previously had a Bumble account of his own. Bumble contacted J.W., advising her that she was "creating quite a buzz." Ex. 17, p. 199. The subject line of the email from Bumble read, "[J.W.], You're Buzzworthy!" *Id.* Because J.W. did not have a Bumble account, she contacted Bumble and was able to log on to the account. In the "About me" section it shows "Tramp with herpes," and in the "My work & education" section it shows "Prostitute at Home." Ex. 16, p. 190. She was notified by Bumble that one of the posted pictures violated Bumble's guidelines and was taken down. One of the pictures was a picture only sent to R.W. and depicted J.W. wearing a shirt R.W. gave her. The hearing date for the Illinois protective order filed by R.W. was scheduled for October 2, 2019, the day after J.W. discovered the fake Bumble account.

[21]    Two days prior to the Indiana hearing, R.W. filed a motion to dismiss claiming that the trial court needed to dismiss the matter because R.W. had a pending petition for order of protection against J.W. in Illinois where he is a resident. His argument continued by asserting that J.W.'s Indiana petition was required to be dismissed because pursuant to Indiana Code § 34-26-5-6(4), she needed to

---

[1] According to the provider, "Bumble is a social network that allows you to feel empowered while you make those connections, whether you're dating, looking for friends, or growing your professional network." *See,* www.bumble.com.

file it in Illinois. J.W. filed a response to both the motion for continuance and the motion to dismiss.

[22] An evidentiary hearing was held on October 30, 2019 and November 5, 2019. While being questioned during the hearing, R.W. asserted his Fifth Amendment right and refused to answer 32 questions. To briefly summarize, he invoked his Fifth Amendment right and refused to answer questions about his awareness and knowledge of K.B.'s acquisition of the nude photos of J.W. and her intentions to use them.

[23] J.W. filed a motion asking the trial court to find that R.W.'s Fifth Amendment invocation resulting in his refusal to answer questions in this civil action compelled the trial court to reach an adverse inference against R.W. as to those matters. After evidence was heard and submitted, the trial court issued a permanent order of protection in favor of J.W. on November 7, 2019 and entered findings of fact and conclusions thereon when it granted the order on November 8, 2019.

[24] Criminal charges were filed against K.B., and J.W. also requested a protective order against K.B. Appellant's App. Vol. II, pp. 9-10.

## 1.

[25] R.W. challenges the trial court's denial of his motion to dismiss J.W.'s petition. It is apparent from the motion that the relief sought was (1) dismissal as a sanction for violation of Indiana Code section 34-26-5-5, or (2) transfer of the

matter to the court in Illinois. The contents of the motion suggest a challenge to the trial court's jurisdiction over the particular case; i.e., the "trial court's right, authority, and power to decide a specific case within the class of cases over which a court has subject matter jurisdiction." *See Kondamuri v. Kondamuri*, 799 N.E.2d 1153, 1156 (Ind. Ct. App. 2003), *trans. denied.* "A judgment rendered by a court that lacks jurisdiction over the particular case is voidable and requires a timely objection or the lack of jurisdiction over the particular case is waived." *Id.* at 1156-57.

[26] J.W. filed her petition for order of protection on September 19, 2019. After R.W.'s request for a continuance of the initial hearing date was granted, he "filed a Motion to Dismiss on October 28, 2019 indicating an existing *ex parte* Order of Protection had been issued for R.W. and against J.W. on September 11, 2019." Appellant's Br. p. 4. In his motion, R.W. contended that J.W. ran afoul of the provisions of Indiana Code section 34-26-5-5 (2002). *See* Appellant's App. Vol. II, p. 26.

[27] That section of the Indiana Code provides that,

> *At a hearing* to obtain an order for protection, each party has a continuing duty to inform the court of:
>
> (1) each separate proceeding for an order for protection;
>
> (2) any civil litigation;
>
> (3) each proceeding in a family, domestic relations, or juvenile court; and

(4) each criminal case;

> involving a party or a child of a party. The information provided under this section must include the case name, the case number, and the county and state in which the proceeding is held, if that information is known by the party.

(Emphasis added).

[28] This challenge requires interpretation of this statute. "Our standard of review for the interpretation of statutes is de novo." *Quinn v. State*, 45 N.E.39, 44 (Ind. Ct. App. 2015). We will assume for the sake of argument that R.W.'s objection was timely despite his prior motion for continuance. Although it is correct that J.W.'s petition indicates "NA" in the section of the petition asking for information regarding any other cases which she and R.W. had pending, *see* Appellant's App. Vol. II, p. 16, the statute clearly states that *at a hearing*, the parties have a continuing duty to inform the court. R.W.'s motion informed the court, and the matter was brought to the court's attention at the hearing. Indeed, the record is not clear about whether J.W. had yet received service of the order granting R.W.'s Illinois emergency order of protection after the Porter County Sheriff received it on September 13, 2019, which was prior to the filing of her petition.

[29] Additionally, the existence of the Illinois proceeding initiated by R.W. between the two did not preclude J.W. from seeking her own order of protection in Indiana where she lived. *See N.E. v. L.W.*, 130 N.E.3d 102 (Ind. Ct. App. 2019) (fact that husband was subject to no-contact order as to wife did not prohibit

wife from seeking protection order against husband).  Indiana Code subsections 34-26-5-6 (2) and (3) (2003) explicitly provide that "a petitioner is not barred from seeking an order because of another pending proceeding" and that "[a] court may not delay granting relief because another pending action exists between the petitioner and the respondent."

[30]     R.W. further contends that,

> The Porter Superior Court erred by failing to transfer J.W.'s Petition to the Illinois Circuit Court where an *ex parte* Order of Protection had already been issued prior to the Porter Superior Court's hearing on extending J.W.'s *ex parte* Order of Protection.

Appellant's Br. p. 9.  R.W. cites Indiana Code section 34-26-5-6(4) in support of his argument.

[31]     Indiana Code section 34-26-5-6(4) provides in pertinent part:

> The following rules apply to an order for protection issued under this chapter:
>
> . . . .
>
> (4)  If a person who petitions for an ex parte order for protection also has a pending case involving:
>
> (A) the respondent; or
>
> (B) a child of the petitioner and respondent;
>
> the court that has been petitioned for relief shall immediately consider the ex parte petition and then transfer that matter to the court in which the other case is pending.

[32] Of the three reported cases analyzing this statute, only one, *Sims v. Lopez*, 885 N.E.2d 15 (Ind. Ct. App. 2008), involves the issue of transfer between courts. *See also S.H. v. D.W.*, 139 N.E.3d 214 (Ind. 2020) and *N.E.*, 130 N.E.3d 102. In *Sims*, the former wife's Lake County ex parte petition should have been transferred to either St. Joseph County or LaPorte County where the former husband's civil actions against her or her current husband were pending. Thus, it is apparent that in this subsection of the statute, the Indiana legislature intended to consolidate Indiana actions between or involving these particular parties and provided for the transfer of actions *between Indiana courts* to meet that end. *See Sims*, 885 N.E.2d at 17. This conclusion finds further support in the legislature's choice of specific language referring to actions in other states in another section. *See* Ind. Code § 34-26-5-5 (continuing duty to notify court of case name, number, county and *state* involving pending litigation between parties).

[33] J.W., a Porter County resident, properly filed her petition with the trial court because Indiana Code section 34-26-5-4 (2002) gives a court of record jurisdiction to issue a civil order for protection in the county in which the petitioner currently or temporarily resides. Thus, the trial court correctly denied R.W.'s motion to dismiss the petition and correctly retained jurisdiction over the matter instead of transferring it to Illinois.

## 2.

[34] Next, R.W. contends that the trial court erred by finding and concluding that J.W. had established that an order of protection was necessary. In particular, R.W. argues as follows:

> The Court further noted in its Findings of Facts that "[s]omehow [K.B.] came into possession of the nude pictures of [J.W.]," that "[R.W.] asserted his Fifth Amendment privilege declining to respond to about as many questions as he agreed to answer," that the questions to which he pleaded the Fifth "mostly involved his awareness or knowledge of [K.B.'s] acquisition of the nude photos and her intentions to use them," and that "[t]here is no evidence [R.W.] tried to stop or block [K.B.'s] harassment or stalking behavior" regarding these photos.
>
> ***
>
> In its Conclusions of Law, the Court stated that though a civil litigant may freely invoke their Fifth Amendment privilege, "he may not necessarily be shielded thereby from a negative inference of the fact finder for using the privilege[.] [T]aking into consideration the questions [R.W.] answered as well as those to which he declined to answer [on the basis that the answer might incriminate him,] the Court concludes that like [K.B.], [R.W.] was engaged in bringing harassment to bear on [J.W.]"

Appellant's Br. p. 9 (internal citations omitted) (quoting Appellant's App. Vol. II, pp. 11-12).

[35] The appropriate standard of review has been set forth in *C.S. v. T.K.*, 118 N.E.3d 78, 81 (Ind. Ct. App. 2019), which we reproduce here.

Protective orders are similar to injunctions, and therefore in granting an order the trial court must sua sponte make special findings of fact and conclusions thereon. We apply a two-tiered standard of review: we first determine whether the evidence supports the findings, and then we determine whether the findings support the order. In deference to the trial court's proximity to the issues, we disturb the order only where there is no evidence supporting the findings or the findings fail to support the order. We do not reweigh evidence or reassess witness credibility, and we consider only the evidence favorable to the trial court's order. The party appealing the order must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them de novo.

(internal citations and quotations omitted).

[36]     Pursuant to the Indiana Civil Protection Act, *see* Ind. Code § 34-26-5-2 (2019), "(a) [a] person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a: (2) person who has committed stalking . . . .; (b) [a] person who is or has been subjected to harassment may file a petition for an order for protection against a person who has committed repeated acts of harassment against the petitioner." According to Indiana Code section 34-6-2-34.5 (2019) "domestic and family violence also includes stalking. . . ." Stalking is defined as "a knowing or an intentional course of conduct involving *repeated or continuing* harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened,

intimidated, or threatened." Ind. Code § 34-45-10-1 (1993) (emphasis added). "Harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuous impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2 (1993). "Impermissible contact" includes but is not limited to knowingly or intentionally following or pursuing the victim. Ind. Code § 35-45-10-3 (2019). "[T]he term 'repeated' in Indiana's anti-stalking laws means 'more than once.'" *Johnson v. State*, 721 N.E.2d 327, 332-333 (Ind. Ct. App. 1999), *trans. denied.*

[37] To sum up the evidence before the trial court and in the words of the trial court, "[s]ome time between August 10th and September 11th the matter blew up and all of the parties involved, [K.B.], [R.W.] and [J.W.] were saying nasty things to each other, back and forth imploring the other to leave them alone." Appellant's App. Vol. II, p. 10. The evidence and inferences therefrom supporting the issuance of the protective order in favor of J.W. was that K.B. was with R.W. after his relationship with J.W. soured. When they were together, R.W. had shared with J.W. his plans to send the video of a nude K.B. to the man she was then dating. A part of the plan involved creating a new account on social media through which to reach that man at work. J.W. counseled against R.W.'s plan.

[38] R.W. left a threatening voicemail for J.W., which made J.W. feel threatened and terrified. R.W. made several attempts by various means to contact J.W.'s

husband. During a period of time where K.B. was with R.W. in Chicago, she downloaded semi-nude and nude pictures of J.W. from R.W.'s password-protected phone. She then sent them to J.W. and R.W. with her own disparaging commentary about what was depicted, further adding commentary purported to be from B.O.

[39] R.W. contacted J.W. to inform her that "somehow" K.B. had come into possession of those photographs. He did nothing to stop any action by K.B. despite this awareness. K.B. feigned sympathy for J.W., adding that she did not want those photographs to come into the hands of J.W.'s four young sons or husband or be disseminated to her children's school and through the City of Valparaiso even though "someone" had told her that those actions were a possibility.

[40] Just prior to the hearing set for the Illinois protective order, J.W. discovered that a Bumble account had been created with her email address containing pictures of her, one of which she had only sent to R.W. and the other of which had to be taken down from the account. The words used in that account to describe J.W. bore a striking similarity to the language used by K.B. when discussing her theory that J.W. had herpes and that her behavior was trashy or tramp-like.

[41] At the hearing on J.W.'s protective order request, R.W. refused to answer 32 separate questions pertaining mostly to how K.B. came into possession of the

pictures of J.W. that were meant only for R.W. and the creation and existence of the Bumble account, citing his Fifth Amendment privilege against self-incrimination. "Although the refusal to testify in a civil case cannot be used against the one asserting the privilege in a subsequent criminal proceeding, the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness'[s] refusal to testify." *Hardiman v. Cozmanoff*, 4 N.E.3d 1148, 1151 (Ind. 2014) (quoting *Gash v. Kohm*, 476 N.E.2d 910, 913 (Ind. Ct. App. 1985)).

[42] The trial court correctly found from the evidence and the inferences from the evidence that "there is no evidence that R.W. tried to stop or block [K.B.'s] harassment or stalking behavior utilizing or threatening to use the photos against [J.W.]," and correctly concluded that "like [K.B.], [R.W.] was engaged in bringing harassment to bear on [J.W.]" Appellant's App. Vol. II, pp. 11-12. There was more than sufficient evidence to support the trial court's findings of fact which, in turn, support the conclusions of law in favor of granting J.W.'s petition for a permanent protective order against R.W.

# Conclusion

[43] For the reasons stated above, we conclude that the trial court did not err by failing to transfer J.W.'s petition to Illinois, and did not err by finding and concluding that sufficient evidence existed to support issuing a permanent order of protection in favor of J.W.

[44]    Judgment affirmed.

Mathias, J., concurs.

Crone, J., concurs with separate opinion.

| | |
|---|---|
| Rafer Weigel, | Court of Appeals Case No. |
| *Appellant-Respondent,* | 19A-PO-2697 |
| v. | |
| J.W., | |
| *Appellee-Petitioner.* | |

**Crone, Judge, concurring.**

I agree with the affirmance of the protective order against Rafer Weigel, but I write separately because I respectfully disagree with my colleagues' decision to refer to Weigel by his initials instead of his name.

No statute, court rule, or court policy entitles Weigel to anonymity. In fact, pursuant to the Rules on Access to Court Records adopted by the Indiana Supreme Court, Weigel's name is presumptively accessible to the public. *See* Ind. Access to Court Records Rule 4(A) ("A Court Record is accessible to the

public except as provided in Rule 5.").[2] Some of the stated purposes of those rules are to "[c]ontribute to public safety" and "[p]romote governmental accountability and transparency[.]" Ind. Access to Court Records Rule 1(B). These overlap with the stated purposes of the Civil Protection Order Act, which was enacted by the Indiana General Assembly "to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; (2) protection and safety of all victims of harassment in a fair, prompt, and effective manner; and (3) prevention of future domestic violence, family violence, and harassment."

[47] As described in lurid detail above, Weigel threatened and publicly humiliated J.W., who sought and obtained a protective order against him. Weigel has challenged the sufficiency of the evidence supporting that order. If we had ruled in his favor, he could have petitioned to expunge all records relating to the protective order pursuant to Indiana Code Chapter 34-26-7.5. But since we have affirmed the trial court's determination that Weigel harassed J.W., I can think of no principled reason why this Court should shield his identity from the

---

[2] *See* Ind. Access to Court Records Rule 3 (defining "Court Record" to include "Case Record," which "means any document, information, data, or other item created, collected, received, or maintained by a Court, Court agency or Clerk of Court in connection with a particular case."). Exceptions to the Rules' presumption of public access to court records include "Case Records excluded from Public Access or declared confidential by Indiana statute or other court rule[.]" Ind. Access to Court Records Rule 5(B)(2). Certain case records in protective order proceedings (including information regarding the petitioner/protected person) are excluded from public access pursuant to statute, but those records do not include the respondent's name.

public. Indeed, naming the perpetrator of such depraved acts could only contribute to public safety, promote governmental transparency and accountability (by this Court and by any law enforcement agency that might have occasion to enforce the protective order, respectively), and prevent future harassment of J.W. and others.